IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LOURA MECHELLE DALTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 7:13-CV-136 |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Loura Mechelle Dalton ("Dalton") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Dalton alleges that the Administrative Law Judge ("ALJ") erred by not giving her treating physician's opinion controlling weight, improperly discrediting her own testimony, and failing to obtain the testimony of a vocational expert. I conclude that substantial evidence supports the ALJ's decision on all grounds. As such, I **RECOMMEND DENYING** Dalton's Motion for Summary Judgment (Dkt. No. 11), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 15.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Dalton failed to demonstrate that she was disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## BACKGROUND AND CLAIM HISTORY

Dalton was born on June 24, 1964 (Administrative Record, hereinafter "R." at 19), and is considered a younger person under the Act as of her alleged onset date. 20 C.F.R. § 404.1563. Dalton is insured through December 31, 2005 (R. 49) and therefore must show that her disability began before the end of her insurance period and existed for twelve continuous months to receive DIB. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Dalton has a high school education (R. 37) and has worked as seamstress, account executive, and office manager. R. 176. Dalton did not complete a function report regarding her daily activities during the relevant period. R. 18.

Dalton protectively filed for DIB on July 30, 2009, claiming that her disability began on August 4, 2004. R. 49, 150. The state agency denied her application at the initial and reconsideration levels of administrative review. R. 49–65. On October 17, 2011, ALJ Thomas W. Erwin held a hearing to consider Dalton's disability claim. R. 24–47. Dalton was represented by an attorney at the hearing, which included testimony from Dalton. R. 24–47.

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

On November 2, 2011, the ALJ entered his decision analyzing Dalton's claim under the familiar five-step process[3] and denying Dalton's claim for benefits. R. 9–20. The ALJ found that Dalton suffered from the severe impairments of left ankle post–traumatic arthritis and status–post right ankle injury. R. 14. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 15. The ALJ further found that Dalton retained the residual functional capacity ("RFC") to perform the full range of sedentary work.[4] R. 15. The ALJ determined that Dalton could not return to her past relevant work (R. 19), but that Dalton could work at jobs that exist in significant numbers in the national economy. R. 19. Thus, the ALJ concluded that she was not disabled. R. 20. On February 19, 2013, the Appeals Council denied Dalton's request for review (R. 1–6), and this appeal followed.

## ANALYSIS

Dalton argues that the ALJ's decision denying benefits is not supported by substantial evidence for three interrelated reasons in connection to Dalton's ankle impairments. First, Dalton alleges that the ALJ should have given more weight to the opinion of her treating physician, James Chandler, M.D., regarding the debilitating nature of Dalton's ankle injuries. Dalton next contends that the ALJ erred by discrediting her own testimony about the severity of her ankle

---

[3] The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are requires occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

3

pain. Finally, Dalton argues that the ALJ erred by failing to obtain the testimony of a vocational expert to establish that she was capable of performing work available in the national economy.

## Treating Physician

Dalton alleges that the ALJ erred by failing to give more weight to the opinion of Dalton's orthopedic surgeon, James Chandler, M.D., with respect to the functional limitation caused by Dalton's ankle injuries. Dalton saw Dr. Chandler as early as October 1999 and performed multiple surgeries on Dalton's left ankle, all prior to the relevant period. Dr. Chandler completed a functional capacity assessment at the request of Dalton's attorney on June 1, 2010. Dr. Chandler indicated that Dalton had limitations that would preclude her from working at the sedentary level, and that the limitations related back to the relevant period, e.g. prior to December 31, 2005, Dalton's date last insured. The ALJ found that the restrictive limitations found by Dr. Chandler were not supported by the medical record, specifically noting that post-operative x-rays of Dalton's left ankle showed a solid fusion, records showed full motor strength, Dalton reported less pain, and that she went several months without follow-up. R. 18. For these reasons, the ALJ gave Dr. Chandler's opinion limited weight. I find that substantial evidence supports this evaluation of Dr. Chandler's opinion.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of

4

controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

Dalton broke both of her ankles in a motor vehicle accident in 1986, the left worse than the right. R. 288. Dalton has since had numerous surgeries on her left ankle, including multiple arthroscopies (R. 215–18, 288), an anterior osteophyte resection in 1999 (R. 219–21), and most recently an arthrodesis fusion performed by Dr. Chandler in 2002 (R. 206–08). Follow-up x-rays from less than two weeks after Dalton's 2002 ankle fusion showed good position of the hardware and fusion site. R. 273. X-rays from approximately six weeks out showed the hardware was in excellent position, although there were early signs of callus formation at the fusion site. R. 272. Twelve weeks post-fusion Dalton reported to Dr. Chandler that she still had pain, but that it was better than it was pre-operation, and that she could feel her toes where she was unable to feel them prior to the surgery. R. 270. X-rays also showed an early union in her left ankle. Five months post-fusion in January 2003 Dalton reported some discomfort in the ankle, but again reported having "much less pain than she had preoperatively." R. 269. On physical examination, Dr. Chandler noted some compensatory midfoot motion, along with normal alignment and no swelling. X-rays showed solid arthrodesis in her left ankle. Dr. Chandler also discussed career choices that would probably include a "sit down occupation." R. 269.

5

In February 2003, Dalton reported twisting her right ankle when she slipped down some steps carrying laundry. R. 268. However, Dalton stated that the "left side is just now getting pretty good" and that although there still is a little discomfort here and there, she wished she had gotten the fusion "a long time ago." Dr. Chandler found that her left ankle had no compensatory midfoot motion, no swelling, and no pain. Dr. Chandler noted that Dalton was "doing well" status-post left ankle arthrodesis, and diagnosed a right ankle osteochonral lesion. Dr. Chandler discussed possible surgery on her right ankle, although Dalton was reluctant to seek surgery at the time.

One year post-fusion in August 2003, Dr. Chandler noted that Dalton's left ankle didn't seem to be bothering her very much, although she did have some pain on the ball of her foot under both feet and some in the arch. R. 226. Dr. Chandler noted that her left ankle was not swollen, was a little tender around the surgical scars, but there was no pain with ankle motion. Dr. Chandler diagnosed metatarsalgia (pain and inflammation in the ball of the foot) due to overload of the forefoot, and expected that this could be treated conservatively with stretching and Ultram.

In March 2004, five months prior to her alleged onset of disability, Dalton reported some pain in her left ankle, and that her right ankle felt weak. R. 225. Dr. Chandler found that Dalton's left ankle was in neutral position, she had palpable hardware but was not tender, and that there was no pain with subtalar motion. X-rays of the left ankle showed a solid complete subtalar fusion with "very good" alignment, and no problems with the screws. Dr. Chandler noted that with regard to Dalton's right ankle, she was not having any mechanical symptoms, but that it was just giving way. Dalton agreed again that she would like to avoid surgical intervention on her right ankle.

6

On May 10, 2004, three months prior to Dalton's alleged onset date, Dalton reported that she had injured her left knee in a domestic altercation. R. 238. Dalton stated that the pain was worse when she was sitting, and that she walked with a limp, although the knee was not locking up or giving out on her. A nurse practitioner recommended a knee brace or compression wrap with elevation, and suggested Ibuprofen or Lortab for pain. R. 238. X-rays of Dalton's left knee were negative for fractures or dislocations, and were otherwise unremarkable. R. 255–56. On June 2, 2004, Dalton reported continued left knee pain to Robert B. Stephenson, M.D., of Valley Orthopedics and Sports Medicine. R. 223. Dr. Stephenson noted some tenderness on examination, but found that flexion and extension of the knee was essentially full and non painful. Dr. Stephenson diagnosed a possible medial meniscal injury and possible bone bruise medial compartment. A later MRI ruled out a meniscal injury or bone bruise, and Dalton was diagnosed with a left knee strain. R. 222. By July 12, 2004, Dalton reported that the knee was doing "somewhat better" and a physical examination revealed some tenderness and pain but was otherwise unremarkable. Dalton received a knee injection and Dr. Stephenson refilled her prescription for Lortab.

Only a handful of medical records exist from the narrow, alleged disability period between August 4, 2004 and December 31, 2005, and only one specifically addresses her ankle impairments. Dalton cut her left hand and received stitches in September 2004 (R. 257–59) and reported some cervical soreness after falling on the floor in another domestic altercation. R. 239. Dalton reported that the cervical soreness had gotten better but persisted, and nurse practitioner Judy Branscom found no tenderness and a full range of motion in her neck. Ms. Branscom recommended conservative treatment with Ibuprofen, heat, and stretching. In November 2004, Dalton reported thumb pain, which was confirmed on examination by Ms. Branscom. R. 233. X-

7

rays showed no fractures (R. 254) and Dalton was referred for follow-up and prescribed an anti-inflammatory for the pain. R. 233. On November 15, 2004, Dalton saw D. Daniel Bradley, M.D., for a rash on her left leg as well as thumb pain. R. 234. A physical examination showed 5/5 muscle power and was largely unremarkable. Similar findings regarding muscle strength were made by Dr. Bradley on November 22, 2004, and Dr. Bradley noted that Dalton's pain was improving. R. 235.

Dalton saw Dr. Chandler for a follow-up to her left ankle fusion on March 25, 2005. R. 224. Dalton reported that she was happy with the fusion, but that it still bothered her because she could feel the screws and that "because of the lack of soft tissue around her ankle, she bumps on almost everything." Dr. Chandler found that the ankle appeared well aligned and non-tender, but that it was tender and that the screw sights were sensitive and Dalton also had some discomfort in the plantar fascia. X-rays showed a "well-fixed ankle fusion in good position" with screws in good position, although the screws were "prominent enough to where they would conceivably bother her." Dr. Chandler discussed removal of the hardware with Dalton, and Dalton was directed to call if she wanted to schedule the removal procedure.

On June 22, 2005, Dalton reported sacral pain from falling in the bathroom after her ankle gave out. R. 232. X-rays revealed no fracture but some degenerative changes. R. 247. Dr. Bradley and Dalton also discussed her "high-stress" living situation and the fact that she moved out of her home away from her abusive husband.

The medical records are silent for more than three years following Dalton's July 2005 visit with Dr. Bradley. On October 1, 2008, well past Dalton's date last insured, Dalton saw Dr. Chandler again for problems relating to her ankle. R. 263. Dalton reported "good relief" from the 2002 fusion, but that she continued to have problems around her ankle and foot, as well as pain

8

and cramping in her calf and arch. Dr. Chandler noted a mildly antalgic gait when Dalton walked, no ankle motion, tenderness in her Achilles tendon, but "no evidence of dysfunction." Dalton had "a little bit of compensatory midfoot function, but not terribly functional, though" and tenderness along her plantar fascia. X-rays showed that the left ankle still had a solid ankle arthrodesis, and "a little bit" of changes in the subtalar joint. Dr. Chandler noted that "[a]t present, patient is unable to do any job standing or walking and is disabled for that." R. 263. Dr. Chandler prescribed an ankle foot orthosis (AFO) with plantar padding and a rocker sole, and a prescription for Ultram.

State agency doctor Michael Hartman, M.D. evaluated Dalton's medical file and rendered his opinion of Dalton's functional capacity on November 16, 2009. R. 49–56. Dr. Hartman concluded with regard to exertional limitations that Dalton could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; had unlimited ability to push and/or pull except with regard to limitations lifting and carrying. R. 53. With regard to postural limitation, Dr. Hartman determined that Dalton could frequently balance and climb ramps/stairs, and occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. R. 53. Dr. Hartman also determined that Dalton should avoid concentrated exposure to hazards such as machinery and heights, but otherwise found no environmental limitations. R. 54.

A second state agency doctor, Joseph Duckwall, M.D., reviewed Dalton's medical records on reconsideration in March 2010. R. 58–65. Dr. Duckwall reaffirmed Dr. Hartman's findings, assessing an identical RFC. R. 62–64. The ALJ accorded both state agency opinions limited weight regarding Dalton's physical abilities in light of the fact that additional evidence

9

was submitted following their assessments, including Dr. Chandler's later opinion, and that they did not have an opportunity to observe Dalton's hearing testimony. R. 19.

On June 1, 2010, Dr. Chandler rendered his opinion of Dalton's functional capacity that is at issue in this appeal. R. 307–08. Dr. Chandler noted a primary diagnosis of ankle arthritis status post fusion, and noted clinical findings that Dalton's ankle was stiff and tender. Dr. Chandler concluded that Dalton could sit for at least six hours in an eight-hour workday, and stand/walk for less than two hours in an eight-hour workday. Dr. Chandler further found that Dalton could only occasionally carry up to ten pounds in a competitive work situation. Dr. Chandler determined that Dalton's pain or other symptoms would interfere constantly with her ability to maintain attention and concentration. Due to her impairments or treatment, Dr. Chandler predicted that Dalton would be absent from work more than four times a month, and specifically noted that Dalton had "flare-ups" that required bed rest two times a month. Finally, Dr. Chandler indicated that his conclusions of Dalton's functional limitations related back to the relevant period between August 4, 2004 and December 31, 2005.

The foregoing medical record supports the ALJ's decision to not give Dr. Chandler's 2010 opinion controlling weight. It is apparent from the ALJ's analysis that the he closely examined Dalton's history of ankle problems and Dr. Chandler's numerous treatment records from before, during, and after the relevant period. The ALJ left no doubt that Dalton's ankles limited her ability to work; the ALJ's decision provides a detailed account of Dalton's surgeries, follow up visits, and complications. However, sufficient evidence in the record supports the ALJ's determination that Dalton was not disabled and could perform sedentary work during the narrow relevant period between August 4, 2004 and December 31, 2005.

Imaging studies consistently showed that Dalton's left ankle was properly fused with hardware following the 2002 surgery, and the records of Dr. Chandler following the surgery did not suggest disabling dysfunction. R. 273 (August 14, 2002: "good position of the hardware and fusion site"), R. 272 (September 17, 2002: "hardware to be in excellent position"), R. 270 (October 29, 2002: "early union"); R. 269 (January 3, 2003: "solid arthrodesis"); R. 225 (March 8, 2004: "solid complete subtalar fusion in very good alignment with no problems with the screws"); R. 224 (March 25, 2005: "well-fixed ankle fusion in good position and screws are in good position, although are prominent enough to where they would conceivably bother her"); R. 263 (October 1, 2008: "solid right ankle arthrodesis. She has a little bit of changes in the subtalar joint"). Moreover, as the ALJ noted, Dalton reported less pain following the ankle fusion, and that she was pleased with the operation's results overall. R. 224–26, 268–70. Dr. Chandler even at one point discussed Dalton's post-fusion career options that would probably include a "sit down occupation," which is compatible with the ALJ's RFC of sedentary work. R. 269.

Also noted by the ALJ was the scant follow-up treatment on Dalton's ankles during the relevant period—a fact that may be properly considered in considering the severity of Dalton's condition. Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994) ("[A]n unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility."). The only treatment note from Dr. Chandler within the relevant period reflects some pain and discomfort in Dalton's ankle (R. 224), but this is not inconsistent with the ability to perform sedentary work. While Dalton had other, non-ankle related problems during that time (e.g. hand laceration, thumb pain, rash, sacral pain) nothing in the record suggests that these other injuries rose to the level of disabling conditions. R. 232–35, 239, 257–59. Physical examinations from the relevant period

11

did not suggest that Dalton was unable to perform sedentary work, and she was described as having "muscle power 5/5 throughout" by Dr. Bradley twice in November 2004. R. 234–35.

Moreover, the ALJ crafted an RFC more restrictive than that of the two state agency doctors who each found Dalton capable of performing a range of light work. The ALJ accorded the state agency opinions on Dalton's physical abilities limited weight because they did not have the additional evidence submitted after their review or Dalton's hearing testimony. R. 19. The ALJ reasoned that Dalton's limitations were neither as severe as determined by Dr. Chandler, nor that she was as capable in her abilities as determined by Drs. Duckwall and Hartman. The ALJ did not substitute his opinion for that of Dr. Chandler, but was instead performing the essential function of resolving conflicts in the opinion evidence. Woodhouse ex rel. Taylor v. Astrue, 696 F. Supp. 2d 521, 533 (D. Md. 2010) ("In cases…where there are conflicts in the evidence and differing medical opinions, ALJs have the duty to resolve those conflicts and the corresponding ability to disagree with a medical opinion, so long as substantial evidence supports the position the ALJ takes.").

I also note that Dr. Chandler's 2010 opinion came years after Dalton's date last insured, although Dr. Chandler relates the opinion back to the relevant period in the check-the-box form supplied by Dalton's attorney. While the Fourth Circuit has recognized that a treating physician may properly offer a retrospective opinion on the extent of an impairment in the past, see Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991), "[l]ike all other opinions by a treating physician on the nature and severity of a claimant's impairments, a retrospective opinion must be supported by medically acceptable clinical and laboratory diagnostic techniques and must not be inconsistent with other substantial evidence in the case record." Ewald v. Astrue, 6:10-CV-00047, 2011 WL 5828719, at *3 (W.D. Va. Nov. 18, 2011)

(citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). From a medical record which showed largely benign radiographical findings, improved pain, and gaps in treatment, the ALJ was entitled to accord little weight to the opinion of Dr. Chandler. Accordingly, I find that substantial evidence supports the ALJ's treatment of Dr. Chandler's opinion.

### **Pain and Credibility**

Dalton also contends that the ALJ improperly discounted her subjective complaints of pain, and that the ALJ failed to adequately consider her pain as provided under the regulations. Specifically, Dalton argues that the ALJ "failed to independently evaluate Plaintiff's pain as a separate consideration except to summarily dismiss the severity of that pain and to presume, without basis in the record, that any pain suffered by Plaintiff was addressed by a limitation to sedentary work." Pl.'s Br. Summ. J. 5. Dalton also alleges that the ALJ failed to address Dalton's "flare-ups" of pain as testified to at the administrative hearing. I find that substantial evidence supports the ALJ's analysis of Dalton's pain, and find no basis to remand on this ground.

"While the pain caused by an impairment, independent from any physical limitations imposed by that impairment, may of course render an individual incapable of working, allegations of pain and other subjective symptoms, without more, are insufficient." Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996) (citing Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980)). The Fourth Circuit has recognized a two-step process to determine whether pain has rendered a claimant disabled by pain. Hines v. Barnhart, 453 F.3d 559, 564–66 (4th Cir. 2006). First, the claimant must establish with objective medical evidence that she suffers from an impairment that could reasonably be expected to cause pain. Id.; see also Craig, 76 F.3d at 594. "It is only *after* a claimant has met [this] threshold obligation . . . that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be

13

evaluated." Craig, 76 F.3d at 595 (citing 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1)) (emphasis in original). During this second step, while the claimant may rely entirely on subjective evidence, objective evidence remains relevant. Hines, 453 F.3d at 565. In other words, while the absence of objective medical evidence of the intensity, severity, degree, or functional effect of pain is not determinative, id., a claimant's allegations about her pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Craig, 76 F.3d at 595 (citing 20 C.F.R. § 416.929(c)(4)). Furthermore, the claimant cannot make a showing of disability merely by demonstrating that she experiences pain. Green v. Astrue, 3:10CV764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing Hays, 907 F.2d at 1457–58) ("An individual does not have to be pain-free in order to be found 'not disabled.'"), report and recommendation adopted, 3:10CV764, 2011 WL 5599421 (E.D. Va. Nov. 17, 2011). The pain must be so severe as to prevent the claimant from performing any substantial gainful activity.

There is no dispute that Dalton's ankle impairments could reasonably be expected to cause pain; the inquiry's focus is instead whether her pain is as severe as she alleged during the relevant period. Dalton testified at the administrative hearing[5] that on some days she can't get up out of bed or otherwise walk or stand because her foot locks up and can't put any weight on it. R. 33–34. Dalton stated that "the only thing that I've ever found to really help a whole lot is to get off my feet and get my foot up in a position that's almost level with my heart…." R. 34. Dalton further stated that "it's not always bad days," but that when her foot flares up, she "can't take a single step." R. 35. Dalton testified that she was not on any medication on a regular basis

---

[5] I note that although the ALJ emphasized at the beginning of the administrative hearing that the relevant evidentiary period was prior to December 31, 2005, it is not entirely clear from the record that Dalton's testimony was contained to the relevant period, and did not implicate more recent developments in her functional ability.

14

back in 2005 (R. 32) and that she didn't want to take pain medicine because it makes her sick. R. 35. Dalton said that the screws in her left ankle cause pain, especially when she hits them on objects. R. 42–43. Dalton explained that she occasionally uses a cane and crutches. R. 44.

Credibility determinations are emphatically the province of the ALJ, not the court, and courts normally should not interfere with these determinations. See, e.g., Chafin v. Shalala, No. 92-1847, 1993 WL 329980, at *2 (4th Cir. Aug. 31, 1993) (per curiam) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) and Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964)). Here, the ALJ's credibility determination is supported by substantial evidence. It should not be disturbed. See Johnson v. Barnhart, 434 F.3d 650, 658-59 (4th Cir. 2005) (per curiam) (citing Craig, 76 F.3d at 589). For similar reasons as to why the ALJ's handling of Dr. Chandler's opinion is supported by substantial evidence, so too is the ALJ's evaluation of Dalton's credibility. The objective medical record from the relevant period shows largely benign radiographical findings, infrequent ankle treatment, and largely unremarkable physical examinations. Moreover, "the ALJ, when assessing the credibility of Claimant's subjective symptoms, was permitted to consider the gap between Claimant's alleged onset date of disability and the date Claimant filed for disability benefits." Shuppe v. Astrue, 5:07CV57, 2008 WL 4296747, at *19 (N.D.W. Va. Sept. 18, 2008) aff'd sub nom. Shuppe v. Comm'r of Soc. Sec., 322 F. App'x 350 (4th Cir. 2009). The fact that Dalton filed for benefits many years after her alleged onset date was another permissible consideration in evaluating Dalton's credibility.

Nor was it error for the ALJ to fail to explicitly mention Dalton's "flare-ups" in his decision. "While the ALJ must evaluate all of the evidence in the case record, the ALJ is not required to comment in the decision on every piece of evidence in the record, and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not

15

considered." Brewer v. Astrue, 7:07-CV-24-FL, 2008 WL 4682185, at *3 (E.D.N.C. Oct. 21, 2008). Here, the ALJ explicitly stated that he considered Dalton's "subjective complaints with regard to pain, precipitating and aggravating factors, medications and other treatment, any functional restrictions, and the claimant's daily activities." R. 18. The ALJ provided a summary of Dalton's hearing testimony, which included her statements that some days she is unable to get up and has to crawl to the bathroom, that she has to use crutches and a cane on occasion, that she has "good days" and "bad days" and the extent that she uses pain medication. R. 16. Although the ALJ specifically did not recount the portion of Dalton's testimony about the frequency and severity of her pain "flare-ups," he did not ignore her testimony alleging disabling pain. The ALJ did, however, discuss Dalton's pain "flare-ups" in the context of Dr. Chandler's opinion. R. 18.

As the ALJ accurately stated at the administrative hearing, "[t]he issue, in this case, is not, really, what [Dalton's] functional status is right now. We have to go back and figure out what it was at the very latest, as of December 31st of 2005." R. 27–28. Viewed as a whole, the record supports the ALJ's conclusion that during the narrow relevant period between August 4, 2004 and December 31, 2005, Dalton experienced some pain, but not disabling pain. The ALJ did not find that Dalton was pain free. To the contrary, the ALJ found that Dalton suffers from severe conditions that greatly limit her ability to function. The ALJ accounted for the limitations imposed by Dalton's conditions by limiting her to sedentary work, the lowest level of physical exertion. The ALJ's opinion reflects adequate consideration of the pain caused by Dalton's conditions, and since substantial evidence supports the ALJ's determination of Dalton's credibility regarding her pain, I cannot recommend reversal or remand on this basis.

## Vocational Expert

Dalton's final argument challenges the ALJ's decision to not obtain testimony from a vocational expert ("VE") and solely rely on the Medical-Vocational Guidelines in determining that Dalton could perform work in the national economy. Specifically, Dalton argues that use of the Medical-Vocational Guidelines was precluded because of her chronic pain, which she describes as a nonexertional impairment. The ALJ found that Dalton's residual functional capacity allowed her to perform the full range of sedentary work, i.e. her residual functional capacity was not reduced by any nonexertional factors. The ALJ then relied on Medical-Vocational Rule 201.28, which directs a "not disabled" outcome for an individual of Dalton's age, education, work experience, and RFC. R. 20. After reviewing the record, I find substantial evidence supports this finding by the ALJ at step five.

The Commissioner bears the burden at step five of the sequential analysis to show the existence of a significant number of jobs in the national economy that a claimant can perform given his RFC. To aid in making this determination, the Commissioner promulgated the grid tables located at 20 C.F.R. Part 404, Subpart P, Appendix 2. Washington v. Astrue, 698 F. Supp. 2d 562, 571 (D.S.C. 2010). The grids are tables that "indicate the proper disability determinations for various combinations of age, education, and previous work experience in conjunction with the individual's residual functional capacity…." Hall v. Harris, 685 F.2d 260, 265 (4th Cir. 1981). Each grid, however,

> considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

17

Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.1989) (citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)). When the Commissioner is unable to rely on the grids in making the step five determination, he must use a vocational expert to prove that jobs exist in the national economy which the claimant can perform. Walker, 889 F.2d at 49–50.

"[N]ot every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids" and thus the "proper inquiry…is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." Walker, 889 F.2d at 49. If not, the Commissioner may properly rely on the grids to sustain the burden at step five of proving the existence of jobs the plaintiff can perform. Hammond v. Heckler, 765 F.2d 424, 425–26 (4th Cir. 1985). "This inquiry is a question of fact and is therefore reviewed by this court only to evaluate if the finding is supported by substantial evidence." Long v. Apfel, 2000 WL 1469542, at *4 (W.D. Va. Aug. 23, 2000).

The Commissioner argues that "[t]he evidence from the relevant period of August 2004 to December 31, 2005, fails to demonstrate that Plaintiff had ankle pain, or any other pain, that was severe enough to constitute a non-exertional limitation[]." Def.'s Br. Summ. J. 16. I agree. Dalton primarily relies on her own testimony and the opinion of Dr. Chandler for the proposition that her pain interferes with her ability to perform work of which she was exertionally capable. However, as discussed above, substantial evidence supports the ALJ's decision to discredit this evidence and find that her symptoms were not as severe as alleged. Additionally, the medical record from the narrow relevant period fails to substantiate that Dalton's pain was not taken into account in the ALJ's assessment of her exertional abilities. Put differently, the medical records do not suggest that Dalton's ankle pain interfered with her ability to work at the sedentary level.

Her chief pain complaint from the relevant period was that she often bumped her ankle screws on objects (R. 224), a concern addressed by limiting her to a largely stationary range of work that primarily involves sitting.

When pain causes a limitation in one of the seven strength demands—sitting, standing, walking, lifting, carrying, pushing, and pulling—"the limitation must be considered exertional." SSR 96-9P, 1996 WL 374185, at *5 (S.S.A July 2, 1996). The evidence in the record shows that Dalton's ankle pain affected her ability to stand and walk, and beyond Dr. Chandler's discredited opinion that her pain interfered with her attention and concentration, no evidence in the record supports limitation in anything other than strength demands. Any limitation caused by Dalton's pain must therefore be considered exertional, and accordingly, the ALJ could properly rely on the Medical-Vocational Guidelines to direct a finding of "disabled" or "not disabled." As this analysis is supported by substantial evidence in the record, I must affirm the ALJ's decision.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file

specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

          Enter:  July 8, 2014

          *Robert S. Ballou*

          Robert S. Ballou
          United States Magistrate Judge